Lisa A. Ferrari (LF8081)
COZEN O'CONNOR
277 Park Avenue
New York, New York 10172
Tel:  (212) 883-4900
Fax:  (646) 588-1459
Email:  lferrari@cozen.com

James A. Gale (*pro hac* to be filed)
E-mail:  jgale@cozen.com
Samuel A. Lewis (*pro hac* to be filed)
E-mail:  slewis@cozen.com
Matthew N. Horowitz (*pro hac* to be filed)
E-mail:  mhorowitz@cozen.com
COZEN O'CONNOR
Southeast Financial Center
200 South Biscayne Blvd., Suite 3000
Miami, Florida 33131
Telephone:  305-358-5001

*Attorneys for Plaintiff MobilizeAmerica, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
MOBILIZEAMERICA, INC.,

             Plaintiff,                        Civil Action No. _____

v.

1, INC. d/b/a GOLDEN,

             Defendant.
--------------------------------------------------------x

## COMPLAINT

Plaintiff, MobilizeAmerica, Inc. ("Mobilize"), sues Defendant, 1, Inc. d/b/a Golden

("Golden"), and alleges:

## NATURE OF THE ACTION

1.      This is an action for declaratory relief pursuant to the Federal Declaratory Judgment

Act (28 U.S.C. §§ 2201 and 2202), namely, that Golden's execution of a Termination and Release

Agreement containing a release in favor of Mobilize insulates Mobilize from liability against the causes of action that Golden now seeks to bring against Mobilize; and that Mobilize has not violated either the Federal Defend Trade Secrets Act of 2016, California's Uniform Trade Secrets Act, or New York's common law on trade secret misappropriation by virtue of Mobilize offering of its platform for political event management and volunteer recruitment.

## THE PARTIES, JURISDICTION AND VENUE

2.      Mobilize is a Delaware corporation with a principal place of business in New York, New York.

3.      Golden is a Delaware corporation with a principal place of business in Venice, California.

4.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §1331 because Mobilize seeks relief under the Declaratory Judgment Act in connection with alleged violations of the Federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §1836, *et seq.*

5.      This Court has supplemental jurisdiction over the attendant declaratory relief claims based on state law pursuant to 28 U.S.C. § 1367, because such claims arise from a common nucleus of operative facts, and thus the federal and state causes of action are inextricably intertwined.

6.      This Court has personal jurisdiction over Golden pursuant to NY CPLR § 302 because the claims set forth herein arise out of Golden contracting with Mobilize in New York to provide goods and services in New York and in this District. Additionally, Golden contractually agreed that this Court has sole and exclusive jurisdiction of the parties and this dispute.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, as a substantial portion of the events giving rise to Mobilize's claims occurred in, arose in, caused harm in, and/or relate to this Judicial District. Further, Golden has contractually agreed that this District is the sole and exclusive forum for disputes arising between the parties.

## GENERAL ALLEGATIONS

8.      Mobilize is a software company that focuses on making it easier for political campaigns, advocacy organizations, companies, governments and nonprofits to engage supporters, manage events and recruit volunteers.

9.      Mobilize was founded in 2017 by a group of people with backgrounds in government and political activism.

10.     In early 2017, with the November election cycle fast approaching, Mobilize sought ways to quickly bring its ideas to the political arena and allow political committees to easily organize events and recruit volunteers.

11.     In connection with those efforts, Mobilize identified Golden, a software company that had a mobile application ("App") and web-based administrative platform (the web-based portion was also referred to as a "dashboard"), which allowed non-profits to mobilize volunteers.

12.     Given the similarities between organizing political activists and non-profit volunteers, Mobilize thought that if certain improvements were made to Golden's App and platform, it might be able to be used to help Mobilize reach its intended user base.

13.     Thus, Mobilize entered into negotiations with Golden to develop a white-label version of Golden's App and platform.

14.     White-label arrangements commonly involve manufacturers or providers who remove their own branding from a product or service, and instead, allow the product or service to be branded with the customer's brand.

15.     In this case, Mobilize negotiated with Golden to release a version of Golden's App and platform so that it carried Mobilize's brand as opposed to Golden's brand.

**Mobilize and Golden Enter Into The First Agreement**

16.     On or about May 25, 2017, Mobilize and Golden entered into a Software-as-a-Service ("SaaS") Agreement with Golden ( the "First Agreement") under which Golden licensed a "white-labeled" version of Golden's App and platform to Mobilize.

17.     Pursuant to the first Agreement, Golden also agreed to develop certain public-facing web-based functionality for its platform to meet Mobilize's needs.

18.     The First Agreement also expressly permitted Mobilize to build additional functionality on top of the white-label version of the App.

19.     However, it became quickly apparent that there were severe limitations associated with the use of Golden's App and platform.  Golden's web-based administrative interface, sometimes referred to as a dashboard, was particularly problematic.  Even the public-facing web page that Golden developed to facilitate volunteer sign-ups was poorly designed, and it complicated matters by requiring end-users to create an account and password before signing up for an event.  Instead, Mobilize wanted to make the end-user experience as simple as possible.

20.     Mobilize sought to address some of the deficiencies in Golden's App and platform by developing its own web-based interface.  However, Mobilize's web-based interface required access to Golden's back-end system so that Mobilize's customers' information would be the same

whether end-users accessed the information through the white-labeled App or through Mobilize's web interface.

21.     Golden, however, did not provide Mobilize with direct access to Golden's back-end system.

### Mobilize Pays For Development Of Golden's API

22.     While Golden was not open to providing Mobilize with direct access to Golden's back-end system, it was willing to allow Mobilize to have certain limited access through an application programming interface ("API") if Mobilize paid Golden to develop the APIs.

23.     As a result, Mobilize and Golden negotiated for Golden to develop an API that would allow Mobilize's web interface to interact with Golden's platform in such a way to allow Mobilize's customers to access the same information, regardless of whether they were using Golden's App or Mobilize's web interface.  The API was intended to facilitate the creation of Mobilize's intended feature set and to allow Mobilize to create its intended user experience for its customers.

24.     Ultimately, Mobilize and Golden entered into a second SaaS Agreement dated August 20, 2017 (the "Second Agreement"), pursuant to which Mobilize paid Golden for, *inter alia,* the development of an API for Golden's platform.

25.     The Second Agreement provided a description of the APIs that Golden became obligated to develop, and the sum that Mobilize was obligated to pay Golden for such development work.  Mobilize paid Golden the agreed-upon sum.

26.     If Golden was not aware of Mobilize's intention to develop its own web-based interface prior to August, 2017, it was certainly aware of this after executing the Second Agreement.

27.      Since Golden only provided Mobilize with limited access to Golden's platform through the API, Mobilize had no choice but to develop its own distinct database and maintain copies of its data and its customers' data.  Otherwise, Mobilized risked losing the data when the API failed to work properly.

28.      Thus, when working with its own database and with Golden's App, Mobilize also had to develop tools that would keep the data between these two systems in sync.  Otherwise, Mobilize's customers would see different data when using the white-labeled mobile App than it would see when using Mobilize's own web interface, and vice versa.

29.      Thereafter, Golden started to develop and deliver portions of the API. Unfortunately, the API functionality that Golden delivered had numerous problems, and efforts to resolve these problems highlighted deeper problems with the relationship between Golden and Mobilize.

30.      For instance, Mobilize would identify issues and problems for Golden, but Golden was slow to fix the problems, and at times, suggested impractical or ineffective alternatives instead of fixing the problems.

31.      Such was the case for a problem identified in September 2017 where Mobilize's customer was unable to login to the administrative interface for the white-labeled version of the system.  By early October, the problem had still not been resolved.

32.      In another instance, the white-labeled version of the App was supposed to let end-users sign up to volunteer for specific time slots.  However, that function did not work.  In early-to mid-October, Mobilize worked with Golden to track down and fix the problem, only to have Golden delay pushing out the fix for the issue.

33.    Then, on October 24, 2017, only a few weeks before elections, certain end-users could not sign up for events.  Golden finally discovered that there was a bug in Golden's Android version of the App that failed to create users properly.

34.    All in all, in the lead-up to various elections in November 2017, Mobilize's technical staff attempted to work closely with Golden's technical staff to achieve Mobilize's intended functionality, but ultimately, such efforts were not successful.

35.    Some of the technical limitations of Golden's App and platform were so significant that Mobilize's non-technical staff resorted to entering data directly into its customers' CRM applications, and bypassing Golden's App entirely.

36.    To make matters worse, Golden's technical staff was either unresponsive or failed to appreciate the time-sensitive nature of supporting an App and platform that was intended to support various groups involved with the November elections.

**Mobilize Discontinues Using Golden's App and Platform**

37.    After the elections in November 2017, Mobilize decided that it could no longer wait for Golden to deliver on its failed promises.

38.    One of Mobilize's long-term goals was to achieve integration with other political campaign software, and all of Mobilize's research and development relating to such integration concluded that Golden would need to make extensive changes to its App and platform, which it was not inclined to do.  Moreover, such changes were likely to be cost-prohibitive.

39.    Mobilize had already expended considerable resources attempting to support customers who were using two completely different systems—Golden's Mobile App and Mobilize's own web interface—and Mobilize did not see any realistic end to the problems arising from juggling information between two parallel systems in the foreseeable future.

40.     At the same time, as far as Mobilize was aware, less than 200 people had downloaded and used the white-labeled version of Golden's mobile App.

41.     Ultimately, Mobilize realized the only rational decision it could make was to discontinue using Golden's mobile App, and to avoid dependency on anything associated with Golden's platform.

42.     Thereafter, Mobilize eliminated from its web-interface all of the code used to access Golden's API.  After removing the code used to access Golden's API, Mobilize utilized an Open Source rapid-development framework to create its own platform, and to move forward with development of other functionality on its product road map.

43.     While Mobilize ended up giving up certain functionality available in a native mobile App, it also found that it could provide a more consistent user experience by adapting its own web interface so that users would experience substantially the same interface regardless of whether they used a web browser on a computer or a web browser on a tablet or smartphone.

44.     Mobilize did not use any of Golden's confidential or proprietary information in developing its own system.  Rather, Mobilize developed its platform from the ground up based on its own experience, extensive user research, by listening to its customers' feature requests, and by analyzing industry trends.

45.     Mobilize's system may offer a handful of features that are common to Golden's current App, but these features are common in the industry and offered by many of Mobilize's and Golden's competitors.  More importantly, given the different approaches—Mobilize's web-based approach and Golden's mobile App approach—the coding for the features is almost certainly different as the web-based language and development framework that Mobilizes uses is not really appropriate for use when developing native mobile Apps.

46.     By January, 2018, Golden undoubtedly realized that Mobilize had discontinued using Golden's mobile App, and eliminated dependence on any aspect of Golden's platform.  Since Golden deployed the white-labeled version of the App to Apple's App Store, Golden could see that users downloaded the white-labeled version of the App infrequently.  Similarly, Golden could see that Mobilize's customers were no longer entering events into Golden's platform.  Even communications between Mobilize's and Golden's engineers, which had frequently occurred prior to the November 2017 elections, effectively ceased.  Ultimately, there was no way that Golden could believe that Mobilize was continuing to use Golden's white-labelled mobile App or platform after 2017.

47.     Recognizing Mobilize's lack of use of Golden's mobile App, Golden's CEO, Sam Fankuchen, finally asked Mobilize why it was not using the white-labeled App during a telephone call on or about June 22, 2018.  Thus, Golden was aware that Mobilize had decided to pursue a different approach to providing a solution for its customers.

48.     During the same call, Mr. Fankuchen even admitted to Mobilize that Golden realized that *it* needed to take a direction more like Mobilize's from branding, web solution and embeddability perspectives, and that it had already taken steps to emulate Mobilize's approach.

49.     Roughly a week later, on June 28, 2018, when NBC News reported that the Democratic National Committee had adopted Mobilize's platform as a "unified 'marketplace' for volunteers," Mr. Fankuchen sent Mobilize a message through the Slack service *congratulating* Mobilize for having *its* platform selected.

50.     A few weeks later, on July 18, 2018, Mobilize requested that Golden remove the white-labeled mobile App from the various app stores.  Doing so would prevent people from

downloading the white-labeled mobile App and not seeing any content.  Golden indicated that it would remove the App.

### Golden and Mobilize Terminate the Agreements

51.     In 2019, in preparation for seeking a round of investment funding, Mobilize reviewed *inter alia* the First Agreement and Second Agreement to ascertain if Mobilize had any existing obligations or liabilities that would need to be disclosed to potential investors.

52.     At that time, Mobilize realized that although it had stopped using the white label version of the Golden mobile App and Golden's system, Mobilize nonetheless potentially owed certain obligations to Golden under the First Agreement and Second Agreement.

53.     Specifically, under the First Agreement, Mobilize agreed that it would "help Golden by providing strategic advice related to unlocking revenue from political users, including the expected deployment of a fundraising tool."

54.     Similarly, the Second Agreement provided *inter alia* that "[i]n instances when Mobilize[] sells Golden software plans to its end users (Community and Professional Plans), Mobilize[] and Golden will split revenues on base pricing at a 50-50 rate."

55.     For its part, Golden recognized that it had certain obligations and liabilities to Mobilize.

56.     In an effort to end their relationship cleanly and without leaving either party potentially liable for any alleged failures under the First Agreement and Second Agreement, in or about August, 2019, Mobilize and Golden entered into a Termination and Release Agreement, a copy of which is attached as **Exhibit 1**.

57.     The Termination and Release Agreement had the effect of voiding the First Agreement and Second Agreement, and terminating the parties' respective obligations thereunder.

58.     The Termination and Release Agreement also included a mutual release, pursuant to which, Mobilize and Golden released each other from any and all claims arising from the First Agreement and Second Agreement, regardless of whether those claims were known or unknown and whether those claims matured before or after the effective date of the Termination and Release Agreement.

59.     At the time the parties' entered into the Termination and Release Agreement, Golden was well aware that Mobilize had developed its own system.

60.     Indeed, the Termination and Release Agreement merely reflected the reality of that which had existed since December, 2017, namely, that Mobilize and Golden had decided to pursue different paths for providing features and functionality for their respective customers.

**Golden Falsely Accuses Mobilize**

61.     In late February, 2020, Mobilized launched a new website.  In addition to targeting its traditional, political customer base, the new Mobilize website specifically referenced nonprofit organizations as potential users of Mobilize's platform.

62.     A day later, on or about February 29, 2020, Golden's CEO sent a text message to Mobilize's CEO.  In his message, Golden's CEO said that he needed "clarity between Mobilize repositioning to be a direct competitor to Golden…."  Golden's CEO also asked if Mobilize saw "some other approach that makes Golden and Mobilize stronger together through a partnership."

63.     Mobilize's CEO responded that "[i]t's been a while since I've heard about [Golden's] business….  Would love to hear more about how it's going, where you're growing and where you expect to go."

64.     A few weeks later, on March 16, 2020, Mobilize received a letter from Golden's counsel (the "March Letter").  A copy of the March Letter is attached as **Exhibit 2**.

65.     In the March Letter, Golden falsely accused Mobilize of misappropriating its alleged trade secrets disclosed under the First Agreement and Second Agreement in violation of the DTSA, New York's common law, and California's Uniform Trade Secrets Act.

66.     In an effort to circumvent the Termination and Release Agreement, the March Letter goes further, claiming that the Termination and Release Agreement was nothing more than a failed attempt to "obtain a lawful waiver for acts of intentional trade secret misappropriation under the guise of terminating a prior license agreement" and that "Mobilize's attempt to immunize itself [under the Termination and Release Agreement] is unlawful and unenforceable."

67.     All of the information Golden alleges that constitutes its trade secrets was publicly available, never provided to or used by Mobilize, and/or information Mobilize provided to Golden to develop the APIs and make other changes Mobilize requested to the white-labeled version of Golden's App.

68.     For example, a number of the concepts that Golden claims in the March Letter constitute trade secrets are included among the "features" it ***publicly discloses and describes*** on both the main page and FAQ page of its website, goldenvolunteer.com. These include features such as "Deep Influence" technology (i.e., referral links), global localization (i.e., altering the language, formatting of dates, times, numbers, and currency based on the country selected), and location technology such as GPS. A copy of portions of Golden's website describing these features is attached as **Composite Exhibit 3**.

69.     Not only was much of this information publicly disclosed by Golden, but it was already regularly used by Golden's and Mobilize's competitors in the industry, including Salesforce, Eventbrite, NationBuilder, and Meetup.

70.     Indeed, some of the concepts, such as global localization, were already widely known within the computer programming industry, so much so that even the Open Source rapid development framework that Mobilize used to develop its own platform includes support for such concepts so that developers can achieve global localization simply by using the rapid development framework.

71.     Golden also falsely claimed that its trade secret information included information related to Facebook Graph API, a programming interface and set of features developed and owned by Facebook, even though Mobilize has not used such features since it stopped using Golden's mobile App, and even though Mobilize does not currently use such features.

72.     Perhaps Golden's most absurd claim involves its alleged trade secrets relating to research, product design, and practices for distribution and operations in foreign markets while complying with the European Union's General Data Protection Regulation ("GDPR").  Golden never provided such information because the GDPR was *not effective* until May 25, 2018, months *after* Mobilize had transitioned away from Golden's App and platform.  Moreover, Mobilize's platform as currently designed is only intended for use in the United States.

73.     Golden further claimed that it provided information to Mobilize regarding its database architecture even though it never did so, which is why Mobilize had to pay Golden to make the APIs through which Mobilize could access its information stored in Golden's platform.

74.     On information and belief, Golden sent the letter in a bad faith attempt to pressure Mobilize, because Golden now views Mobilize's platform as a competing product.

75.     At the time that Golden sent the March Letter, Mobilize had grown its platform to the point where roughly 1.7 million people have used Mobilize's platform.  In fact, Mobilize's

platform had become so popular that it was beginning to attract labor unions, service-focused nonprofits and government entities.

76.     As a result of Golden's false accusations that Mobilize has misappropriated Golden's purported trade secrets and improper claims that the Termination and Release Agreement is unenforceable, Mobilize is left uncertain as to its rights and obligations under the parties' agreements.

### COUNT I – DECLARATORY RELIEF THAT THE TERMINATION AND RELEASE AGREEMENT IS VALID AND BINDING

77.     Mobilize hereby restates the allegations set forth in Paragraphs 1 through 76 as if fully set forth herein.

78.     Golden asserts, *inter alia*, that the Termination and Release Agreement is unenforceable, and that Mobilize's efforts to immunize itself from claims for misappropriation of trade secrets through the Termination and Release Agreement is unlawful.

79.     However, Golden freely and voluntarily entered into the Termination and Release Agreement and it was supported by consideration, namely, the mutual release of obligations and liability.

80.     The Termination and Release Agreement contains a release as to all claims and causes of action of any nature whatsoever "whether known or unknown, either now accrued or hereafter maturing after the Effective Date of this [Termination and Release Agreement], relating to" the First and Second Agreements and that the agreement "may be pled as a full and complete defense to such claim(s)."

81.     Golden's purported claims of misappropriation relate to the information Golden allegedly provided to Mobilize pursuant to the First and Second Agreements, and therefore, fall within the scope of the release provision of the Termination and Release Agreement.

82.    At the time the parties entered into the Termination and Release Agreement, Golden was aware of the information it provided to Mobilize, that Mobilize had developed its own system, and that Mobilized was licensing its own system to its customers.  Therefore, Golden should have been cognizant of any potential claims it was releasing by entering into the Termination and Release Agreement.

83.    Since Mobilize has not received any allegedly confidential information from Golden since January 2018, if not earlier, any of the allegedly trade secret information that Golden contends Mobilized learned from it was already in Mobilize's possession prior to the time that Golden executed and delivered the Termination and Release to Mobilize.

84.    Mobilize therefore asserts that the Termination and Release Agreement is valid and binding, that any claims either party had against the other in connection with the First Agreement and/or Second Agreement have been released, including Golden's new, spurious claims against Mobilize for misappropriation.  Golden disagrees, and contends in its March Letter that the Termination and Release Agreement is unlawful and unenforceable.

85.    Accordingly, an actual and substantial controversy has arisen and exists between the parties as to the nature of Mobilize's rights under the Termination and Release Agreement.

## COUNT II – DECLARATORY RELIEF THAT MOBILIZE HAS NOT VIOLATED THE DEFEND TRADE SECRETS ACT OF 2016

86.    Mobilize hereby restates the allegations set forth in Paragraphs 1 through 76 as if fully set forth herein.

87.    Golden falsely asserts that Mobilize is liable for misappropriation of trade secrets in violation of the DTSA (18 U.S.C. § 1836 *et seq.*).

88.    Mobilize maintains that it is not liable for misappropriation under the DTSA because the information that Golden claims to be a trade secret does not qualify as "trade secrets"

as defined by the DTSA since: (a) Golden has not taken reasonable measures to keep such information secret, either because Golden has publicly disclosed the information and/or because the information is capable of being reverse engineered; and/or (b) the information Golden claims to be trade secrets are generally known to, and readily ascertainable through proper means by, others who can obtain economic value from the disclosure or use of the information.

89.     Indeed, some of the information that Golden claims to be trade secret is posted on its website or in use by other companies in the same industry.

90.     Accordingly, an actual and substantial controversy has arisen and exists between the parties as to whether Mobilize is in violation of the DTSA.

## COUNT III – DECLARATORY RELIEF THAT MOBILIZE HAS NOT VIOLATED CALIFORNIA'S UNIFORM TRADE SECRETS ACT

91.     Mobilize hereby restates the allegations set forth in Paragraphs 1 through 76 as if fully set forth herein.

92.     Golden has taken the position that Mobilize is liable for misappropriation of trade secrets in violation of California's Uniform Trade Secrets Act ("UTSA") (Cal. Civ. Code § 3426.1 *et. seq.*).

93.     Mobilize maintains that it is not liable for misappropriation under UTSA because the information that Golden claims to be a trade secret does not qualify as "trade secrets" as defined by the UTSA since: (a) Golden has not taken reasonable measures to keep such information secret, either because Golden has publicly disclosed the information and/or because the information is capable of being reverse engineered; and/or (b) the information Golden claims to be trade secrets are generally known to, and readily ascertainable through proper means by, others who can obtain economic value from the disclosure or use of the information.

94.     Indeed, some of the information that Golden claims to be trade secret is posted on its website or in use by other companies in the same industry.

95.     Accordingly, an actual and substantial controversy has arisen and exists between the parties as to whether Mobilize is in violation of the UTSA.

## COUNT IV – DECLARATORY RELIEF THAT MOBILIZE IS NOT LIABLE FOR TRADE SECRET MISAPPROPRIATION UNDER NEW YORK COMMON LAW

96.     Mobilize hereby restates the allegations set forth in Paragraphs 1 through 76 as if fully set forth herein.

97.     Golden has taken the position that Mobilize is liable for misappropriation of trade secrets in violation of New York's common law.

98.     Mobilize maintains that it is not liable under New York's common law because the information that Golden claims to be a trade secret does not qualify as a trade secret since it is publicly available through no fault of Mobilize and is generally known and used by competitors in the industry.

99.     Accordingly, an actual and substantial controversy has arisen and exists between the parties as to whether Mobilize is in violation of New York's common law.

## PRAYER FOR RELIEF

WHEREFORE, Mobilize seeks a declaration from this Court as follows:

I.     In connection with Count I, that the Termination and Release Agreement is valid and enforceable and binding on Golden, and that Golden is barred from bringing claims against Mobilize for misappropriation of any information it received from Golden prior to the effective date of the Termination and Release Agreement or for any other claims;

II.     In connection with Count II, that: (a) any information Golden provided to Mobilize

is not a protectable trade secret under the DTSA; and (b) Mobilize is not liable for

misappropriation under the DTSA;

III.    In connection with Count III, that: (a) any information Golden provided to Mobilize

is not a protectable trade secret under California's UTSA; and (b) Mobilize is not

liable for misappropriation under California's UTSA;

IV.    In connection with Count IV, that: (a) any information Golden provided to Mobilize

is not a protectable trade secret under New York's common law; and (b) Mobilize

is not liable for misappropriation under New York's common law;

V.      In connection with all Counts, awarding Mobilize such further relief as this Court

deems just and proper under the circumstances.

Respectfully submitted,


Dated: April 27, 2020                        By: */s/ Lisa A. Ferrari*
                                                 Lisa A. Ferrari (LF8081)
                                                 E-mail:  lferrari@cozen.com
                                                 COZEN O'CONNOR
                                                 277 Park Avenue
                                                 New York, NY 10172
                                                 Telephone:  212-883-4900
                                                        and
                                                 James A. Gale (*pro hac* to be filed)
                                                 E-mail:  jgale@cozen.com
                                                 Samuel A. Lewis (*pro hac* to be filed)
                                                 E-mail:  slewis@cozen.com
                                                 Matthew N. Horowitz (*pro hac* to be filed)
                                                 E-mail:  mhorowitz@cozen.com
                                                 COZEN O'CONNOR
                                                 Southeast Financial Center
                                                 200 South Biscayne Blvd., Suite 3000
                                                 Miami, Florida 33131
                                                 Telephone:  305-358-5001

***Counsel for Mobilize***

18